Filed 3/28/16  P. v. Limon CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D067001 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD253076) |
| EDGAR LIMON, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Howard H. Shore, Judge.  Reversed and remanded.


Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Kristen Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

" ' "Even those guilty of the most heinous offenses are entitled to a fair trial." ' " (*People v. Wash* (1993) 6 Cal.4th 215, 277 (conc. & dis. opn. of Mosk, J.)  Here, Edgar Limon was found guilty of offenses that society views as among the most morally heinous and abhorrent:  acts of sexual molestation against a child.[1]  As we will discuss, however, because of surprise testimony at trial and rulings that prevented Limon from responding, Limon did not receive a fair trial.  The trial court should have, but did not, declare a mistrial.  We will accordingly reverse the judgment and remand for Limon to be retried.

I

FACTUAL AND PROCEDURAL BACKGROUND

Limon lived with his girlfriend, Heather, and her four sons, the youngest of whom, L.L., was also Limon's biological son.  The family lived in a three-bedroom, two-bath apartment, with one of the bedrooms used as Limon's music studio.  The boys typically used the hallway bathroom, and Heather and Limon used the bathroom connected to the master bedroom.

On the morning of December 24, 2013, Heather left to walk to the store to get food for breakfast.  When she returned a few minutes later, she saw Limon exit the hallway bathroom wearing a towel around his waist and a shirt.  Heather's 10-year-old

---

[1]     Specifically, a jury found Limon guilty of three counts of oral copulation with a child 10 years old or younger (Pen. Code, § 288.7, subd. (b); all further statutory references are to the Penal Code unless otherwise indicated); one count of sodomy with a child 10 years old or younger (§ 288.7, subd. (a)); and two counts of lewd acts on a child (§ 288, subd. (a)), with the further finding of substantial sexual conduct (§ 1203.066, subd. (a)(8)).

2

son, J.H., was in the hallway bathroom taking a shower. Heather was suspicious about why Limon had been in the bathroom with J.H. and asked Limon about it. Limon stated he was going to take a shower in the master bedroom and went to do so.

After J.H. got out of the shower, Heather questioned him about why Limon had been in the bathroom with him. J.H. said he didn't want to talk about it, but Heather told him that it would be okay to tell her. J.H. then disclosed that Limon had forced him to suck Limon's penis in the bathroom. According to Heather, J.H. said that "it had been going on for a very long time." Heather testified at trial that J.H. told her that he had not earlier disclosed the molestation because Limon had said that he would hurt J.H. and Heather if J.H. disclosed. Specifically, Heather stated that J.H. told her about threats by Limon related to items in Limon's music studio that were connected to Limon's religious practice of Satanism. J.H. told her "that [Limon] would hurt us, that he had the devil worshipping stuff in the studio room, and that he was going to hurt [J.H.] with the sword or hurt [Heather] with the sword."

That morning, Heather went to the police with J.H., and J.H. was interviewed by a police officer. J.H. told the police officer that Limon made him suck his penis in the bathroom that morning, that Limon "stuck" his penis in J.H.'s "butt," and that the molestation had been occurring since J.H. was four years old.

A social worker conducted a more extensive forensic interview with J.H. two days later. J.H. described the oral copulation in the bathroom, stated that he had also orally copulated Limon in the bedroom on multiple occasions, and that Limon put his penis in his "butt" about three times. During the interview, J.H. described the contents of Limon's

3

music studio, including the sword, which he believed Limon got from a witch, and other "devil stuff." J.H. stated that the studio was "creepy" and "scary."

Limon was charged and tried on three counts of oral copulation with a child 10 years old or younger (§ 288.7, subd. (b); counts 1-3); two counts of sodomy with a child 10 years old or younger (§ 288.7, subd. (a); counts 4-5); and two counts of lewd acts on a child (§ 288, subd. (a)), with the further allegation of substantial sexual conduct, (§ 1203.066, subd. (a)(8)).

J.H. testified at trial. He described the oral copulation in the bathroom, oral copulation on more than one other occasion, one incident of anal penetration, and an incident during which he was forced to rub Limon's penis with his hand. J.H. testified about the "devilish" stuff in Limon's music studio, including "scary stuff" like a sword and "Halloween thingies," with the sword being the main item that scared him.

Limon testified in his own defense, maintaining that he never sexually molested J.H., and that he was in the hallway bathroom on the morning of December 24, 2013, to get a towel before taking a shower in the other bathroom.

During the course of trial, both the prosecutor and defense counsel asked numerous family members and friends about Limon's practice of Satanism and the religious items in his music studio.[2] During Limon's own testimony, he offered an

---

[2] Evidence of Limon's practice of Satanism was introduced after the admissibility of that evidence was first litigated in Limon's motion in limine to limit testimony on that subject. Considering the issue under Evidence Code section 352 to determine whether the evidence of Satanism should be excluded as unduly prejudicial, the trial court ruled that to the extent that the environment in the apartment related to J.H.'s fear of Limon or

4

extensive explanation of Satanism, explaining how he first became involved with it, the tenets of the religion, and how he practices it.

The jury found Limon guilty on each count except the charge of sodomy with a child alleged in count 5, on which the jury was not able to reach a verdict. Limon admitted a prior strike (§§ 667, subd. (a)(1), 668, 1170.12), and after denying Limon's motion to strike the prior strike, the trial court sentenced Limon to prison for a determinate term of 41 years, and an indeterminate term of 140 years to life.

II

DISCUSSION

Limon contends that the trial court prejudicially abused its discretion by failing to declare a mistrial following the unexpected trial testimony by J.H.'s 13-year-old brother, M.H., during the prosecutor's direct examination.

A.    *Relevant Proceedings*

Near the beginning of M.H.'s testimony, after the prosecutor asked about the fun things M.H. did with Limon, such as playing catch and video games, the subject turned to things that M.H. did not like about Limon.

"[Prosecutor:]  Okay.  Were there ever times that he did stuff that you didn't like?

"[M.H.:]  Well, he tried to, but then it didn't -- I wouldn't let it happen.  He tried to a couple times.

---

J.H.'s reasons for not earlier disclosing the molestation, the evidence of Limon's belief in Satan and related practices was relevant and admissible, and it would consider the admissibility of any particular item of evidence related to Limon's practice of Satanism by ruling on specific objections as they arose during trial.

"[Prosecutor:] What do you mean?

"[M.H.:] Like he would try to touch me in ways that I didn't like to be touched.

"[Prosecutor:] And how was that?"

Defense counsel made an objection. A recess was held during which the prosecutor interviewed M.H., followed by a discussion between the trial court and counsel outside the presence of the jury. The prosecutor reported to the trial court that M.H. had just disclosed to her for the first time that when he was approximately 10 years old, Limon attempted on a few occasions to pull him into a bedroom and touch his private parts, and on one occasion Limon succeeded in touching his genital region.

Defense counsel made a motion for a mistrial, explaining that M.H.'s testimony was a surprise to him, and arguing that Limon would not obtain a fair trial because defense counsel was not given a chance to investigate M.H.'s claims or to effectively cross-examine M.H. or other witnesses concerning M.H.'s claims. Defense counsel stated that, in the alternative, if the trial court was not inclined to declare a mistrial, he should at least be permitted to impeach M.H.'s credibility by introducing certain evidence that the trial court had excluded during motions in limine, subject to the evidence becoming relevant during trial. Specifically, defense counsel proposed to introduce evidence that M.H. made a false accusation in 2008 that Limon had broken M.H.'s leg,[3]

---

[3]    At the preliminary hearing, Heather testified that in 2008 M.H. had claimed that Limon broke M.H.'s leg, which was not true. Limon's motion in limine to introduce evidence of this false accusation appears to suggest that M.H. made the allegation to a social worker.

and that M.H. had spoken to social workers several times in the past, but had never disclosed any molestation.

The trial court responded to M.H.'s surprise statement by first deciding that Limon would not receive a fair trial if the prosecutor was permitted to introduce evidence of Limon's attempt to molest M.H. Specifically, the trial court explained that "the disclosure for the first time in midtrial of a second attempted sexual contact with another child is not a minor disclosure. It's a major disclosure. And there is no way the jury is going to find out about that in this trial." As the trial court explained, "The entire purpose of . . . pretrial discovery is to provide both sides the opportunity to prepare for trial. The revelation of a second felony victim in midtrial obviously runs counter to that. . . . [¶] The issue is what position the defense is now in after preparing for trial and focusing its cross-examination of multiple witnesses on issues relating to [J.H.] and now suddenly being confronted with a second victim. And I just believe it would be unfair to have the jury learn of this conduct, so I'm not going to permit it."[4]

---

4       As counsel discussed with the trial court as part of the mistrial motion, evidence of a defendant's prior sexual offenses may be admissible under Evidence Code section 1108 if the trial court determines that the evidence is not unduly prejudicial under Evidence Code section 352. Specifically, although Evidence Code section 1101 specifies that instances of conduct are generally inadmissible, except "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . .)" (*id.*, subd. (b)), Evidence Code section 1108 creates an exception to section 1101 for prior sexual offenses. Section 1108, subdivision (a) states: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 352, in turn, provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that

7

Next, ruling on the mistrial motion, the trial court concluded that if it instructed the jury to disregard M.H.'s statement, the jury would be able to follow that instruction, and accordingly there was no basis for a mistrial. Specifically, the trial court characterized M.H.'s statement as "very vague" and explained, "[t]here was a comment that was begun to be made which can be ignored if we move on . . . ." Prior to resumption of the prosecutor's examination of M.H., the trial court instructed the jury, "The witness [M.H.] has testified regarding his age, where he goes to school, and with whom he lives. All testimony that occurred after that is stricken, and the jury will disregard it and not consider it in any way." The trial court then proceeded with the trial as if M.H.'s statement never occurred, including precluding defense counsel from introducing impeachment evidence against M.H., as the jury had purportedly not heard any evidence that would make the impeachment relevant.[5]

---

its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Here, in determining that Limon would not obtain a fair trial if the jury heard evidence of Limon's attempt to molest M.H., the trial court was apparently performing an implicit weighing under Evidence Code sections 1108 and 352 to determine that, based on the fact that the attempted molestation came to light for the first time during trial and defense counsel did not have time to investigate or prepare, it would be unduly prejudicial to admit evidence of the attempted molestation.

[5] Regarding defense counsel's request, in the alternative, to introduce evidence that would impeach M.H.'s credibility, the trial court ruled that it would not admit evidence that M.H. made no earlier molestation allegations to social workers unless defense counsel agreed to allow the prosecutor to fully explore M.H.'s allegations during M.H.'s testimony. Defense counsel chose not to allow M.H. to be examined about the allegations of attempted molestation, saying, "I guess we can just ignore it," and instead limited his argument to attempting to obtain admission of M.H.'s false accusation that Limon broke his leg. Regarding that evidence, the trial court stated that it would wait

8

B.  *The Trial Court Prejudicially Abused Its Discretion By Denying the Mistrial Motion*

We proceed to address Limon's contention that the trial court erred by refusing to declare a mistrial.[6]

1.  *Applicable Law*

The law applicable to mistrial motions is well settled.  "A trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' . . . , that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction.' " (*People v. Avila* (2006) 38 Cal.4th 491, 573, citation

---

until hearing M.H.'s testimony on direct examination before it ruled on the admissibility of M.H.'s false accusation that Limon had broken his leg.  An unreported sidebar discussion was held after the conclusion of M.H.'s direct testimony, and defense counsel did not impeach M.H. with the broken leg incident during cross-examination.  The record does not reflect whether the unreported sidebar discussion included a ruling on defense counsel's request to introduce evidence of M.H.'s false accusation that Limon broke his leg.  Limon's argument proceeds on the assumption that the trial court excluded the evidence at the unreported sidebar discussion, and the People do not attempt to dispute that characterization.

6      The People argue that we should not consider Limon's appellate argument that the trial court prejudicially erred in denying the mistrial motion because defense counsel forfeited the argument.  Specifically, the People point to the fact that defense counsel stated "I guess we can just ignore it," when the trial court stated that it would allow the impeachment evidence against M.H. to be introduced only if defense counsel agreed that the jury could hear all of the evidence about M.H.'s allegation that Limon attempted to molest him.  The People's argument lacks merit.  The request for admission of the impeachment evidence was an alternative request, dependent on the trial court's decision to deny the mistrial motion in the first instance.  By stating, "I guess we can just ignore it," defense counsel was not indicating a withdrawal of his mistrial motion, but instead was stating that he had decided to drop the request to admit evidence of M.H.'s prior denials of molestation, as the trial court had presented him with the Hobson's choice of obtaining the admission of the impeachment evidence only if he agreed to admission of surprise allegations that arose in the middle of trial.

omitted.)  "Although most cases involve prosecutorial or juror misconduct as the basis for the motion [for a mistrial], a witness's volunteered statement can also provide the basis for a finding of incurable prejudice."  (*People v. Wharton* (1991) 53 Cal.3d 522, 565.) " 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'  . . .  Accordingly, we review a trial court's ruling on a motion for mistrial for abuse of discretion."  (*Avila*, at p. 573, citation omitted.)

Here, Limon contends that his right to a fair trial was incurably prejudiced because the jury heard M.H. suggest that Limon attempted to molest him, and that was not the type of statement that the jury could reasonably be expected to disregard when instructed to do so by the trial court.  Under those circumstances, Limon contends that the trial court erred in deciding that it could proceed as if M.H.'s statement had never been made, refusing to declare a mistrial, and at the same time preventing Limon from presenting any impeachment evidence that would have called into question M.H.'s credibility.

2.      *The Trial Court Erred In Proceeding as if M.H.'s Statement Could Be Disregarded by the Jury*

The first step in evaluating Limon's argument is to examine whether the trial court erred in concluding that the jury would be able to disregard M.H.'s statement when instructed to do so.  If we agree with the trial court that the jury could reasonably be expected to disregard M.H.'s statement, that will dispose of Limon's contention that the trial court prejudicially erred in denying a mistrial.  If, on the other hand, we conclude that M.H.'s statement was not the type of evidence that the jury could be expected to

10

ignore, we must then consider whether Limon's right to a fair trial was incurably prejudiced by M.H.'s statement, requiring a mistrial.

"Ordinarily, a curative instruction to disregard improper testimony is sufficient to protect a defendant from the injury of such testimony, and, ordinarily, we presume a jury is capable of following such an instruction." (*People v. Navarrete* (2010) 181 Cal.App.4th 828, 834 (*Navarrete*).) As the Supreme Court has explained, a court will "normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions . . . , and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." (*Greer v. Miller* (1987) 483 U.S. 756, 767, citation omitted.) "It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' " (*People v. Allen* (1978) 77 Cal.App.3d 924, 935 (*Allen*).) Nevertheless, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." (*Bruton v. U.S.* (1968) 391 U.S. 123, 135, 136.) "We review for abuse of discretion a trial court's reliance on a curative instruction in place of declaring a mistrial." (*Navarrete*, at p. 834.)

There are two main questions to consider when determining whether the jury could reasonably be expected to follow the instruction to disregard M.H.'s statement: (1) was the statement sufficiently vague and preliminary, as the trial court characterized it, that the jury would not have understood that M.H. was accusing Limon of attempting to

11

sexually molest him; and (2) assuming that the statement was clear enough that the jury would have likely understood that M.H. was referring to attempted sexual molestation, was M.H.'s statement of such a nature that the jury could not reasonably be expected to ignore it when determining Limon's guilt.

a.    *The Jury Likely Understood M.H.'s Statement as Referring to Attempted Sexual Molestation*

Turning to the first issue, we conclude that rather than being "very vague" as the trial court stated, M.H.'s statement was clear enough that the jury likely understood that M.H. was referring to attempted sexual molestation. First, although M.H. did not specifically name a body part that M.H. attempted to touch, because of the peculiar way in which M.H. described Limon's touching, M.H. strongly implied that he was describing attempted sexual molestation. As we have stated, when the prosecutor asked M.H. whether Limon ever did "stuff that you didn't like," M.H. replied that Limon "tried to" but "I wouldn't let it happen." M.H. specified that Limon "would try to touch me in ways that I didn't like to be touched." Most reasonable jurors who had just heard J.H. testify about Limon's lewd acts toward him, would strongly suspect that M.H. was referring to sexual touching by stating that Limon tried to "touch me in ways that I didn't like to be touched." A normal 13-year-old boy would not commonly refer to touching "in ways that I didn't like to be touched," when describing nonsexual physical contact with an adult, such as administering physical punishment or getting into a fight. Indeed, as M.H. demonstrated later in his testimony when describing Limon's other threats of physical violence, M.H. was capable of using plain, straightforward and articulate language in

12

describing those acts, including threats to "drag me across the floor" or "throw me off the balcony," one occasion when Limon "pushed me a few times," and other instances where "it would seem like we were about to fight."

The likelihood that the jurors would have understood M.H.'s statement as referring to attempted sexual molestation is increased by the fact that the jurors heard an almost identical phrase used to describe sexual molestation during J.H.'s testimony. Specifically, when questioning J.H., the prosecutor introduced the subject of sodomy by asking J.H., "Did [Limon] touch you in any other way that you didn't like?" After an affirmative answer from J.H., the prosecutor asked, "Can you describe for us how he would touch you in another way you didn't like?" J.H. proceeded to describe Limon's molestation involving his "bottom." Because the prosecutor's wording was very similar to that used by M.H. when stating that Limon "would try to touch me in ways that I didn't like to be touched," the jury would likely have understood that M.H. was referring to sexual touching as well.

When determining that a witness's unexpected testimony caused incurable prejudice, courts do not require perfect clarity in the witness's statement. Instead, incurable prejudice may arise when it is *likely* that the jury understood what the witness was referring to. For instance, in *Navarrete,* a testifying detective made a statement that did not *directly* inform the jury that the defendant in a prosecution for child sexual molestation had confessed to the crime, but from which the jury could make such an *inference*. Specifically, the detective explained that he had not tested the DNA swabs taken from the crime scene because of "defendant's statement," which the court had ruled

13

"is inadmissible." (*Navarrete, supra,* 181 Cal.App.4th at p. 831.) *Navarrete* concluded that the detective's testimony was incurably prejudicial because, even though it did not clearly refer to a confession, "the inference the jury *may have most reasonably drawn* from learning appellant's statement had dissuaded [the d]etective . . . from testing the swabs is that appellant had confessed or otherwise incriminated himself, rendering DNA evidence unnecessary." (*Id.* at p. 834, italics added.) The trial court's instruction to disregard the testimony "could not undo the damage . . . because the instruction did not break the link the jury *was likely to perceive* between a 'statement' and a 'confession' in the context of other evidence the jury heard." (*Ibid.*)[7] Here, as in *Navarrete*, M.H.'s statement was clear enough that, put in context, the jury likely understood it as referring to attempted sexual molestation.

> b. *A Juror Could Not Reasonably Be Expected to Disregard M.H.'s Statement*

Having concluded that the jury was likely to have understood that M.H. was claiming that Limon attempted to sexually molest him, we next examine whether a reasonable juror could have followed the trial court's instruction to disregard that

---

[7] Similarly, in *People v. Bentley* (1955) 131 Cal.App.2d 687 (*Bentley*) (disapproved on other grounds in *People v. White* (1958) 50 Cal.2d 428, 431), a police officer's testimony improperly suggested (prior to Evidence Code section 1108) that the defendant had been a suspect in a previous child sexual molestation case. As quoted in *Bentley*, the police officer's testimony did not clearly reference another case of *child sexual molestation* by the defendant, but instead vaguely referred to the detective's questioning of the defendant as to " 'activities [defendant] had been involved in in 1942 when he had been a suspect in *another case*.' " (*Bentley*, at p. 689, italics added.) However, the statement was specific enough to create incurable prejudice, which *Bentley* concluded required the trial court to declare a mistrial, explaining that "[w]hen the statement was made the court should have declared a mistrial and discharged the jury." (*Id.* at p. 691.)

14

information.  Here, we conclude that a juror would likely not have been able to disregard the statement, as it was *extremely* relevant to the *main* issue in dispute in the case, namely whether J.H. was credible in his claim that he was sexually molested by Limon.

Importantly, no physical evidence existed to support the People's case that Limon molested J.H.  Instead, the jury's finding as to whether the molestation occurred necessarily turned, for the most part, on its assessment of whether it believed J.H.'s claim or whether it believed Limon's denial.  Defense counsel attempted at trial to cast doubt on J.H.'s credibility through several approaches, including developing evidence that J.H. had previously told lies about Limon, that J.H. did not disclose molestation by Limon when previously asked by social workers, that J.H. had been exposed to pornography and teenagers engaging in sexually related activity, which may have given him the knowledge to describe sex acts; and that J.H. had reason to want Limon removed from the household because of Limon's strict rules and other conduct.  As our Supreme Court has observed, "By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence.  The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations."  (*People v. Falsetta* (1999) 21 Cal.4th 903, 915 (*Falsetta*).)  Indeed, it is fair to say that the *most* relevant issue at trial was whether J.H. was credible in claiming that Limon molested him, and based on the evidence presented at trial, that issue was genuinely in dispute.  When introduced into that context, information from M.H.—another child living in the household—that Limon attempted to molest him would come across as "bombshell" information that could meaningfully influence a juror's view

15

of whether Limon's guilt had been proved beyond a reasonable doubt. (Cf. *People v. Neal* (2003) 31 Cal.4th 63, 86 [evidence of a defendant's confession is an " ' "evidentiary bombshell which shatters the defense" ' "].)

Under similar circumstances in *Bentley*, where the jury improperly heard a statement suggesting that the defendant was suspected of molesting another child, the court explained that because "[t]he defendant stood as one who had been accused of some other sex offense," and the case turned on the credibility of the victim, "[t]he mere direction that the testimony should be disregarded was no antidote for the *poison* that had been injected into the minds of the jurors." (*Bentley*, *supra*, 131 Cal.App.2d at p. 690, italics added.) Here, too, information that Limon attempted to molest M.H. was of so much importance to the central issue of whether J.H.'s molestation claim was credible that a juror could not reasonably be expected to disregard it, even when instructed to do so. This is "the exceptional case" in which " 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' " (*Allen*, *supra*, 77 Cal.App.3d at p. 935.)

3. *M.H.'s Statement Caused Incurable Prejudice to Limon's Right to a Fair Trial*

The final question in our analysis of whether the trial court should have declared a mistrial is whether the prejudice to Limon from M.H.'s statement was of a sufficient magnitude that a reversal of the judgment is required. When assessing whether the trial court *prejudicially* erred in failing to declare a mistrial after evidence was erroneously introduced at trial through the inadvertent testimony of a witness, we examine whether it

16

is "reasonably probable that a result more favorable to defendant would have resulted absent admission of this evidence." (*People v. Welch* (1999) 20 Cal.4th 701, 750, citing *People v. Watson* (1956) 46 Cal.2d 818, 836; see also *Allen, supra,* 77 Cal.App.3d at p. 935 [reversal required because it was "*reasonably probable* that a result more favorable to appellant would have been reached had the prejudicial information of appellant's parole status not been divulged to the jury," italics added].)

As case law recognizes, prejudice from information about the defendant's propensity to commit crimes becomes reasonably probable when "[a]n examination of the record reveals an extremely close case in which the jury had to make its fact determination based upon the credibility of the appellant and his witnesses and of the credibility of the prosecution's witnesses." (*Allen*, *supra*, 77 Cal.App.3d at p. 935 [in case involving a close credibility determination, improper testimony about defendant's parole status from a juvenile case required reversal, despite an instruction that the jury disregard it].) This is such a case.

As we have discussed, in the absence of any physical evidence that Limon molested J.H., and in light of defense counsel's attempts to call J.H.'s credibility into question, the verdict turned primarily on whether the jury believed that J.H. was telling the truth. The introduction of propensity evidence that a defendant is predisposed to commit a certain offense is treated with caution under the law, " 'not because it has no appreciable probative value, *but because it has too much*.' " (*People v. Alcala* (1984) 36 Cal.3d 604, 631.) "[E]vidence from which the trier of fact is permitted to infer both that the defendant has a predisposition to commit sex crimes and that as a result of this

17

predisposition the defendant was likely to commit and did commit the charged sex offense [citation], must be received with the utmost caution." (*People v. Mullens* (2004) 119 Cal.App.4th 648, 666 (*Mullens*).)  In this context, evidence that Limon attempted to molest M.H. was crucial information that would have been extremely powerful in influencing the jury's determination of whether Limon molested J.H.

The impact of M.H.'s statement on the jury's assessment of whether J.H.'s molestation claim was more credible than Limon's denial is amplified because other evidence at trial already created a risk of unfair bias against Limon.[8]  Specifically, as we have discussed, the jury heard extensive evidence that Limon believed in and practiced Satanism, and our Supreme Court has recognized that "[a] favorable view of the biblical figure of Satan is generally understood as a symbolic rejection of the values of love and compassion, and as indicating acceptance of the contrary values of hatred and violence, with a consequent rejection of all moral restrictions on crimes such as murder and rape." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1135.)  With one strike against Limon's credibility based on the common public prejudice against someone who practices Satanism, the risk was increased that M.H.'s statement tipped the jury's credibility determination against Limon.

---

[8]     As part of his appeal, Limon argues that trial court prejudicially erred in admitting evidence of Limon's practice of Satanism that did not relate to *J.H.'s perception* of Limon and had the sole purpose of creating prejudice against Limon based on his religious beliefs.  Because we reverse the judgment on other grounds, we need not, and do not, consider that issue.

The trial court's decision to proceed as if the jury never heard M.H.'s statement was prejudicial to Limon for the additional reason that Limon was prevented from taking steps to counteract the harmful impact of that statement. The jury heard M.H. allege that Limon attempted to molest him, but the trial court prevented Limon from presenting strong impeachment evidence against M.H., consisting of the fact that M.H. had falsely accused Limon of breaking his leg. If the jury was allowed to hear evidence that M.H. had previously made false accusations against Limon, it may not have credited M.H.'s statement that Limon had attempted to molest him.

The absence of an ability to impeach M.H. and the inability of defense counsel to prepare for and investigate M.H.'s allegation is central to the prejudice caused by M.H.'s statement. As our Supreme Court recognized in determining that Evidence Code section 1108 does not violate a defendant's due process rights by permitting the introduction of a defendant's other sexual offenses, a defendant's due process rights are preserved in such a circumstance only because of the *procedural safeguards* built into section 1108. (*Falsetta*, *supra*, 21 Cal.4th at p. 915.) These safeguards include (1) that the defendant receive "*pretrial notice* of the offenses sought to be proved, assuring that the defendant will not be *surprised or unprepared to rebut the proposed evidence*" (*id.* at p. 916, second italics added);[9] and (2) that the trial court assess undue prejudice under Evidence Code section 352, which includes an inquiry into "its likely prejudicial impact on the jurors,

___

[9]    In an action in which evidence is to be offered under Evidence Code section 1108, the People are required to disclose the evidence to the defendant at least 30 days prior to trial, or as soon as it becomes known. (Evid. Code, § 1108, subd. (b); Pen. Code § 1054.7.)

19

[and] the burden on the defendant in defending against the uncharged offense." (*Falsetta*, at p. 917.) Similar considerations also underlie the rule that a defendant confronted by evidence of other sexual offenses must be given the opportunity to introduce evidence that he was *acquitted* of those offenses. (*Mullens*, *supra*, 119 Cal.App.4th at p. 652.) Here, in contrast to the safeguards required before the admission of other sexual offenses under Evidence Code section 1108, Limon's right to due process was compromised, as he received none of the enumerated procedural protections our Supreme Court has held are required to ensure that the admission of another sexual offense does not violate a defendant's due process rights. Defense counsel had no opportunity to investigate and prepare for defending against M.H.'s allegation, to impeach M.H., or to offer other evidence that would call into question the truth of M.H.'s statement.

In sum, in light of the crucial nature of M.H.'s statement to the credibility question that was central to Limon's trial, and the fact that the jury heard M.H.'s statement without any countervailing impeachment evidence against M.H. or other opportunity for defense counsel to rebut the allegation, we conclude that M.H.'s statement was incurably prejudicial. Had the jury not heard M.H.'s statement, it is reasonably probable that Limon would have obtained a more favorable result at trial. Accordingly, the trial court prejudicially abused its discretion in not declaring a mistrial, and we reverse the judgment and remand for retrial.[10]

---

[10]    In light of our disposition, we need not and do not consider Limon's argument that the trial court committed evidentiary error in ruling on objections during the cross-examination of the defense's expert witness Bruce Yanofsky.

20

## DISPOSITION

The judgment is reversed and the matter remanded for retrial.


IRION, J.

WE CONCUR:


NARES, Acting P. J.


McDONALD, J.